UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No.: 21-CV-01148 (JRT/JFD)

| | | |
|---|---|---|
| Contreras & Metelska, P.A. | ) | |
| | ) | Plaintiff's |
| Plaintiff, | ) | Memorandum of |
| | ) | Law Regarding |
| v. | ) | Cross-Motions for |
| | ) | Summary |
| U.S. Immigration & Customs Enforcement; et al., | ) | Judgment |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FACTUAL BASIS

### I.     Plaintiff's FOIA Request & Procedural History

On March 22, 2021, Plaintiff filed a request with the FOIA Office for Immigration & Customs Enforcement ("ICE"). Pinero Decl. ¶ 6, Dkt. 37; Dkt. 27-1 (copy of FOIA request). ICE did not acknowledge Plaintiff's request or assign a request number within the statutory timeframes. Pinero Decl., ¶ 7; 5 U.S.C. § 552(a)(6)(A)(i)(I). On May 4, 2021, Plaintiff filed a Complaint in this Court seeking appropriate relief. Dkt. 1.

Plaintiff and ICE subsequently negotiated the search's scope and search terms to be used. Plaintiff adopts Defendants' summary of these negotiations. *See generally* Defendants' Memorandum ("Def. Memo"), Dkt. 36 at 5.

ICE released 2,436 pages of responsive documents. These pages were marked with bates page numbers 2021-ICLI-00043 0001 to 2021-ICLI-00043 2436. Pinero Decl., ¶ 11.

ICE redacted heavily, relying exclusively on the statutory exemptions found at 5 U.S.C. §§ 552(b)(5), (b)(6), and (b)(7)(C).

Plaintiff filed an Amended Complaint on December 29, 2022 and included a list of 197 specific line-item objections to redactions in table format. Dkt. 27; Dkt. 27-4. Counsel continued to negotiate and resolve some objections. ICE prepared a *Vaughn* index providing a description of each redaction to the corresponding exemption being applied and submitted the *Vaughn* index to the Court and counsel on April 25, 2023. *See* Pinero Decl., ¶ 16; Dkt 37-1 (*Vaughn Index*); *Vaughn v. Rosen*, 484 F.2d 280 (D.C. Cir. 1973).

ICE materially changed position about whether previously claimed exemptions were valid. Defendants' *Vaughn* index concedes that **44** (b)(5) line-item exemptions were claimed in error out of the 144 total (b)(5) line-item exemptions that were challenged by Plaintiff. ICE inflated its claimed (b)(5) exemptions by nearly 50% and changed its position only at the last possible moment when it became clear to Defendants that the Court may insist on *in camera* review of the unredacted versions of each claimed (b)(5) exemption. The *Vaughn* index conceded that eight (b)(6)/(b)(7)(C) line-item exemptions were claimed erroneously. Defendants' index claimed for the first time that four documents were exempted from disclosure under 5 U.S.C. § 552(b)(3) despite having never made such claims in their Amended Answer or in any of ICE's interim responses to Plaintiff's FOIA request.

The *Vaughn* index stated Defendants would provide unredacted versions of the documents that were improperly redacted. No such records have been received by Plaintiff. Exhibit 1 ¶¶ 6-7.

## LEGAL ARGUMENT

### I.   Jurisdiction

This Court has jurisdiction under 5 U.S.C. § 552(a)(4)(E).

### II.   Legal Standard

When adjudicating summary judgment motions under the FOIA:

[The court reviews] whether the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. … "Summary judgment is available to the defendant in a FOIA case when the agency proves that it has fully discharged its obligations under FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." ... To defeat a motion for summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor."

*Miller v. USDA*, 13 F.3d 260, 262 (8th Cir. 1993) (citations omitted). Defendants bear the burden of proving that the withheld documents properly fall within an exemption. *See Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989); *see also* 5 U.S.C. § 552(a)(4)(B) ("the court shall determine the matter de novo" and "the burden is on the agency to sustain its action").

A court's primary role… is to review the adequacy of the affidavits and other evidence presented by the Government in support of its position…. If the Government fairly describes the content of the material withheld and adequately states its ground for nondisclosure, and if those grounds are reasonable and consistent with the applicable law, the district court should uphold the Government's position. The Court is entitled to accept the credibility of affidavits, **so long as it has no reason to question the good faith of the agency.**

*Barney v. IRS*, 618 F.2d 1268, 1272 (8th Cir. 1980) (citations omitted) (emphasis added).

### III.   Defendants' Disclosures Were Untimely.

Defendants admit they violated the FOIA by failing to respond in a timely fashion.

Pinero Decl., ¶ 7; 5 U.S.C. § 552(a)(6)(A)(i). Plaintiff must prevail on Count 1. *See* Dkt. 27.

## IV.    Defendants Unlawfully Withheld Responsive Documents.

The FOIA provides agencies shall withhold information responsive to a FOIA request only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)" or if "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). The agency must "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). Nothing in the FOIA "requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under (b)(3)." 5 U.S.C. § 552(a)(8)(B).

### A. The Affidavit Submitted by Mr. Pinero Is Not Sufficiently Detailed Nor Was It Submitted In Good Faith.

To prevail on an FOIA motion for summary judgment, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *National Cable Ass'n, Inc. v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973) …. The trial judge may rely on affidavits to determine whether an agency has met this burden of proof. "Congress has instructed the courts to accord 'substantial weight' to agency affidavits in national security cases, and these affidavits are equally trustworthy when they aver that all documents have been produced or are unidentifiable as when they aver that the identified documents are exempt." *Goland v. CIA*, 607 F.2d 339, 350 n. 64 (D.C. Cir.1978). The court instructed in *Goland*, that **the agency's affidavits** must be "relatively detailed" and nonconclusory and **must be submitted in good faith.** If these requirements are met, the district court has discretion to forego discovery and award summary judgment on the basis of affidavits. *Id.*

*Davis v. CIA*, 711 F.2d 858, 860 (8th Cir. 1983) (emphasis added).

        i.    *Mr. Pinero's Declaration Was Not Submitted in Good Faith.*

"Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted); *Mace v. EEOC*, 197 F.3d 329, 329 (8th Cir. 1999).

Mr. Pinero's declaration was *not* submitted in good faith.

First, Plaintiff's FOIA request sought copies of emails sent or received by Mr. Stolley, Chief Counsel of ICE's St. Paul-Minneapolis Office of the Principal Legal Advisor ("OPLA"). The request was not for "commercial use" because Plaintiff had "a credible reason to believe that it, and its clients, are being discriminated against in a systemic and unconstitutional manner by Mr. Stolley." Dkt. 27-1 at 6, ¶ 2. Plaintiff's FOIA request provided substantial proof supporting its allegations, citing internally to pages 7-68 of an exhibit consisting of various affidavits and email chains that evidence "Mr. Stolley is discriminating against myriad attorneys and their clients in a systemic and unconstitutional manner." *Id.* The request explained in 10 paragraphs why the request was a matter of public importance and not for commercial use; these arguments and allegations are incorporated by reference. *E.g.*, *id.* at 6-8 ¶¶ 2-11.

Plaintiff's allegations are well-supported in the record. *See* Dkt. 27-1 at 28-185; Exhibit 5. Plaintiff's allegations and supporting evidence indicate one of the country's most powerful federal prosecutors has implemented an office-wide policy, practice, and/or custom of bad faith and unfair dealing with respect to counterparties, attorneys for

noncitizens, and the immigration courts. Consequently, Defendants seek to ensure Plaintiff does not obtain Mr. Stolley's most inflammatory statements of animus, discrimination, and bad faith. The nature of Plaintiff's allegations in combination with the documents filed alongside Plaintiff's FOIA request present credible reasons to doubt whether Mr. Pinero's declaration was submitted in good faith.

Second, juxtaposing Defendants' initial redactions with Defendants' *Vaughn* index demonstrates Defendants redacted substantially more than was lawful in a concerted effort avoid disclosing information to Plaintiff that is harmful to the institutional credibility of Defendants and Mr. Stolley.

The *Vaughn* index admits that in **44 separate instances**, (b)(5) line-item exemptions were claimed in error. *See* Dkt. 37-1. Plaintiff challenged only 144 total (b)(5) line-item exemptions. Defendants' (b)(5) error rate is concerning and circumstantial proof of bad faith by the agency. Defendants did not admit to unlawfully redacting 44 responsive documents under Exemption 5 until the last possible moment (*i.e.*, in the *Vaughn* index); this is proof of bad faith. Had Plaintiff waived challenges to some or all (b)(5) redactions when Defendants requested as much, Defendants would not have subsequently admitted that 44 (b)(5) redactions lacked statutory authority.

The *Vaughn* index concedes that eight (b)(6)/(b)(7)(C) line-item exemptions were erroneous, raising the total number of erroneous redactions to 52. The only plausible explanation for this high error rate is the agency's bad faith.

Third, with respect to the 52 redactions Defendants now concede were improper, the *Vaughn* index states ICE will process the previously redacted information for release.

*E.g.*, Dkt. 37-1 at 61. ICE has not provided Plaintiff with the unredacted records. Exhibit 1 ¶¶ 6-7. The agency knows Plaintiff's motion filing deadline is May 23, 2023. The agency's failure to provide the unredacted versions of the unlawfully redacted records demonstrates Defendants' bad faith attempts to keep those records from Plaintiff and out of the public domain. *See* Exhibit 1 ¶ 8. Defendants know that without those records, Plaintiff cannot cite said records in this memorandum to further establish the agency's bad faith. The agency finalized its *Vaughn* index on or before April 25, 2023. *See* Exhibit 6 at 4 (showing *Vaughn* index was likely finalized around March 8, 2023). Defendants have had sufficient time to provide Plaintiff with the unredacted records and have refused to do so. Exhibit 1 ¶¶ 6-8.

Fourth, prior to the *Vaughn* index's submission, Plaintiff repeatedly communicated to Defendants a deep skepticism of the (b)(5) redactions. As early as November 2, 2021, the Plaintiff stated to Defendants:

> A lot of these b6 and b7c redactions look like they're being applied in a super overbroad manner, and many of the b5 exemptions are suspect. Based on what I'm seeing, I think we need to keep looking through the full universe of documents responsive to the FOIA request. If these exemptions keep getting applied as broadly as they have been, our Vaughn index is going to be huge. Do you want to try and address some of these withholding concerns up front, or would you prefer we deal with everything on the back end?

Exhibit 6 at 1.

On February 25, 2022, Plaintiff stated to Defendants:

> There are going to be a ton of unlawful withholding challenges re: claimed (b)(5) exemptions, so it does not really seem that we're anywhere close to having productive settlement discussions. …

I think limited discovery might be helpful to resolving the unlawful withholding claims. Specifically, I'm thinking about requesting:

1. Documents being relied upon by the processors to determine when to apply (b)(5) classifications,

2. A description of how the (b)(5) exemptions are being determined as (b)(5) exemptions, and

3. A request for admission as to whether (b)(5) exemptions are being applied to responsive emails between Stolley and your office (or OIL, or any other government legal office) in which the redacted material relates to communications about a case in which ICE is not a party.

Exhibit 6 at 2.

On December 29, 2022, Plaintiff's Amended Complaint challenged 144 (b)(5) redactions as unlawful, in addition to challenging certain redactions under Exemptions 6 and 7-C. Dkt. 27 ¶¶ 33-35, 48-50; Dkt. 27-4. Defendants filed an Amended Answer on January 12, 2023 and therein denied that ICE unlawfully withheld documents. Dkt. 28 ¶¶ 33-35, 48-50.

On March 22, 2023, Plaintiff reiterated it would specifically request *in camera* review of every (b)(5) and (b)(3) exemption to "make sure there's not more information withheld than is legal to withhold under the exemptions." Exhibit 6 at 6.

Despite Plaintiff's constant communications concerning the propriety of Defendants' redactions, Defendants refused to voluntarily admit their redactions were unlawful until the last possible moment. Pinero's declaration was not submitted in good faith.

Fifth, the foregoing demonstrates Defendants intended to deprive Plaintiff of the information contained in the responsive records now conceded to have been redacted

unlawfully. Defendants seek to deprive Plaintiff of the use of the information in those documents for purposes of this litigation. This implicates Fed. R. Civ. P. 37(e)(2). The Court should presume that the unlawfully redacted and undisclosed records are unfavorable to Defendants. Though Rule 37 is applicable to discovery issues, FOIA disclosures and discovery disclosures are sufficiently analogous in this circumstance to justify applying Rule 37(e)'s presumption in the present FOIA case. If the Court presumes the records that Defendants have unlawfully withheld are unfavorable to Defendants, that presumption is further evidence of the agency's bad faith.

Sixth, Pinero makes no mention of the *Vaughn* index's 52 concessions that information was redacted unlawfully. *See* Pinero Decl., Dkt. 37. The declaration instead alleges "[a] line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied." *Id.* ¶ 52. Pinero incorrectly swore under oath, "all information not exempted from disclosure pursuant to the FOIA exemptions specified above was correctly segregated and non-exempt portions were released." *Id.* ¶ 53.

The portion of Pinero's declaration regarding segregability is refuted by the *Vaughn* index's 52 concessions that redactions were made unlawfully. Pinero may have perjured himself by stating that all non-exempt portions were released. This demonstrates bad faith.

Seventh, Pinero refused to identify the nondisclosure statute underlies the (b)(3) redactions. *See id.* ¶ 22. Lack of knowledge by FOIA plaintiffs about the content of redacted records during the litigation process necessarily means that plaintiffs quite literally cannot know, and therefore cannot inform the court, whether the government's

factual characterization of the documents as containing information that would support a statutory redaction under 5 U.S.C. § 552(b) is accurate. *See Vaughn*, 484 F.2d at 824. *Vaughn* observed that a plaintiff's lack of knowledge not only hampers his ability to litigate in the district court, but

> **[t]his lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution.** Ordinarily, the facts relevant to a dispute are more or less equally available to adverse parties. In a case arising under the FOIA this is not true, ... and hence the typical process of dispute resolution is impossible....

*Id.* at 824-25 (emphasis added).

By not identifying the nondisclosure statute underlying the agency's (b)(3) redactions, Defendants seriously distort the traditional adversary nature of our legal system's form of dispute resolution. Defendants' request for permission to submit *ex parte* pleadings and argument to the Court implicitly seeks to deny Plaintiff the opportunity to respond to Defendants' arguments. Defendants did not identify any cases supporting their request.

Eighth, Defendants argue that releasing information redacted under Exemption 5 will "profoundly chill the decision-making process across ICE and between ICE and DOJ attorneys." *E.g.*, Pinero Decl., ¶ 29. They argue, "[d]isclosure would discourage the expression of candid opinions and inhibit free and frank exchange of information and ideas between agency personnel and ensure personnel would be less inclined to freely memorialize their thoughts regarding litigation strategies, which would adversely affect the ability of ICE to effectively conduct government business." *Id.* Similar statements are made regarding disclosure of items alleged to be work-product or attorney-client privilege. *See,*

*e.g.*, *id.* ¶¶ 25-35.

Defendants' chilling arguments are curious. Plaintiff has alleged with substantial factual support that the agency's head immigration prosecutors are freely expressing their candid opinions about which opposing attorneys the agency and its employees can discriminate against. Such communications are likely unlawful, unethical, and a violation of the Minnesota and/or California Rules of Professional Conduct. *Accord* Dkt. 27-1 at 36-38, 49-52 (alleging with specificity facts that support finding Mr. Stolley is violating specific rules of professional conduct that apply in the states with power to regulate his law license); *see also, e.g.*, Exhibit 5 at 1-4, 6-7, 9, 12, 18-20, 23-27, 29-30, 32-34, 36, 38, 41-42, 44, 67-71, 73, 80-81, 87, 88-96, 97-98, 100, 102-03, 108-10, 112, 114-15, 118-19, 121-22, 125, 128, 130, 131. This sort of agency communication deserves chilling. To the extent Pinero might be correct about the chilling effect of certain disclosures, this effect is desirable to help stem current widespread and systemic unlawful discriminatory behaviors by government prosecutors. Defendants' concerns regarding potential chilling effects on interagency communications are pretextual bad-faith justifications for unlawfully withholding responsive documents that are harmful to Defendants' and Mr. Stolley's reputations.

Thus, reasons exist to doubt that Pinero's declaration was submitted in good faith. Pinero's declaration is not trustworthy in this case. Plaintiff requests *in camera* review of challenged redacted records for compliance with the FOIA because Defendants are continuing to unlawfully withhold segregable records and information in bad faith.

*ii.    Mr. Pinero's Declaration Is Not Sufficiently Detailed.*

In FOIA cases, agency-employee declarations are only entitled to deference if they are submitted in good faith, sufficiently detailed, and nonconclusory. The only agency-employee declaration submitted was Mr. Pinero's. *See* Pinero Decl. Parts of the declaration are sufficiently detailed; other parts lack reasonable detail and/or are conclusory.

Pinero claims his "statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties." Pinero Decl., ¶ 3. Pinero thus admitted lacking personal knowledge of some information in his declaration by noting that unspecified information was provided by third parties. Pinero does not disclose what information he possessed personal knowledge about and what information he was simply told by someone else before incorporating that information into his declaration. *See id.* Pinero's declaration violates Fed. R. Civ. P. 56(c)(4), which requires that "[a]n affidavit or declaration used to support or oppose a [summary judgment] motion **must** be made on **personal knowledge**." (emphasis added). Consequently, Pinero's declaration should be stricken.

Pinero claims to provide "a description of the process ICE followed upon receiving Plaintiff's FOIA request and the process by which ICE disclosed records located in response to Plaintiff's FOIA request," Pinero Decl., ¶ 4, yet there is no discussion of the process the agency followed when making initial redactions in the rolling disclosures prior to the preparation of the *Vaughn* index. Pinero does not explain how or why the agency improperly redacted at least 52 pages prior to filing a *Vaughn* index. Pinero ignores

Plaintiff's numerous communications to Defendants during the rolling disclosure period regarding the obvious problems with many of Defendants' claimed redactions. *See* Exhibit 6. Pinero does not provide the names or titles of the agency employees or contractors who assisted in responding to Plaintiff's FOIA request. Pinero does not even state his own level of involvement in the agency's response to Plaintiff's FOIA request.

Pinero's declaration lacks sufficient detail as to the grounds for the Exemption 3 redactions. *Supra.*

Pinero's declaration lacks sufficient detail as to the grounds for Exemption 5 redactions. Pinero generally states Exemption 5 was applied to prevent disclosure of documents subject to the deliberative process privilege, attorney-work product, and attorney-client privilege. Pinero Decl., ¶¶ 24-35. Pinero makes numerous conclusory allegations about the purposes of each of these privileges, offering his unqualified opinions as to why each privilege is essential to the agency. *See id.*

Exemption 5's threshold consideration is whether the requested records constitute "inter-agency or intra-agency memorandums or letters" that would be unavailable "by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have construed this somewhat opaque language to "exempt those documents, and only those documents that are normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).

Pinero never states whether the agency determined the redacted emails are records intended to be covered by the phrase "inter-agency or intra-agency memorandums." *See* 5

U.S.C. § 552(b)(5). Without addressing this threshold consideration, Defendants' claims of privilege lack foundation.

Pinero never states whether the agency determined the records redacted under Exemption 5 would typically be privileged in civil discovery. Instead, Pinero describes an incomplete and cursory sampling of the records that were redacted under Exemption 5. *See* Pinero Decl., ¶¶ 25-35.

The communication on page 587, redacted under (b)(5), is not adequately explained in the affidavit or *Vaughn* index. Indeed, the *Vaughn* index briefly notes that a (b)(5) exemption occurred, but it does not explain why the document constitutes attorney-client or deliberative process privileged materials. Dkt. 37-1 at 119-20.

Pinero never mentions whether the agency considered or determined that certain information which might normally be privileged, such as an attorney-client communication and attorney work-product records, are subject to the crime-fraud exception. *See Nat'l Immi. Project of Nat. Lawyers Guild v. DHS*, 2014 WL 6850977, at *5 (S.D.N.Y. Dec. 3, 2014) ("[T]he Court is skeptical of the government's contention that the crime-fraud exception has no applicability in the FOIA context. … Unlike the 'substantial need' exception invoked in *Grolier*, the crime-fraud exception does not depend on the particularized circumstances of the requester. Rather, like the work product doctrine itself, it depends on the nature of the materials sought, and therefore does not undermine Congress's effort to 'provide workable rules.'") (internal citations omitted).

Pinero never mentions whether the agency determined that specific communications (1) were intended to be confidential, (2) were made in non-private settings, (3) were made

in the presence of third persons unnecessary to accomplish the purpose for which the attorney was consulted, or (4) waived privilege by forwarding his communications to third parties. The agency's lack of attention to whether privilege was waived or subject to an exception applicable to the FOIA supports Plaintiff's request that the Court review each challenged redaction *in camera*.

Pinero fails to adequately explain why PII of persons previously employed by Plaintiff was redacted under Exemptions 6 and/or 7-C. *See* Pinero Decl., ¶¶ 20, 42. Plaintiff incorporates by reference all prior and subsequent on this issue. *Infra* at 36-45. Pinero did not discuss how he weighed the privacy interests of such individuals and other third parties against the public's interest in the disclosure of the names, emails, and phone numbers of certain individuals who did not sign a privacy waiver. *See* Pinero Decl., ¶¶ 41-50. Instead, Pinero recited the statutory standard and attempted to flip the burden of proving an exception is valid by incorrectly alleging Plaintiff failed to articulate a sufficient public interest to support disclosure. *See id.*

**B.  Defendants' Exemption 3 Redactions Are Unlawful.**

Exemption 3 protects those documents that are "specifically exempted from disclosure by statute… if that statute… requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld" and "if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to" 5 U.S.C. § 552(b)(3). 5 U.S.C. § 552(b)(3).

The only immigration statute that has been found to qualify under Exemption 3 of the FOIA is 8 U.S.C. § 1202(f), which relates to certain records pertaining to the issuance or refusal of visas to enter the United States. *Accord Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 741-42 (D.C. Cir. 1983).

For an agency to prevail on an Exemption 3 claim, it must first establish as a matter of law that the statute at issue is a nondisclosure statute that meets at least one of the two subparts of Exemption 3. *See, e.g.*, *Reporters Comm. for Freedom of the Press v. Dep't of Justice*, 816 F.2d 730, 735 (D.C. Cir.), *modified on other grounds*, 831 F.2d 1124 (D.C. Cir. 1987), *rev'd on other grounds*, 489 U.S. 749 (1989) ("**[A] statute that is claimed to qualify as an Exemption 3 withholding statute <u>must</u>, <u>on its face</u>, exempt matters from disclosure.** [The court] must find a congressional purpose to exempt matters from disclosure in the actual words of the statute (or at least in the legislative history of FOIA) – not in the legislative history of the claimed withholding statute, **nor in an agency's interpretation of the statute**.") (emphasis added). Once this has been established, the agency must next establish that the records in question fall within the withholding provision of the nondisclosure statute. *See CIA v. Sims*, 471 U.S. 159, 167 (1985).

In determining whether to construe withholding criteria of a nondisclosure statute narrowly or broadly, courts must choose between narrow interpretations consistent with the strong disclosure policies specifically embodied in the FOIA and broad restrictive interpretations based on deferential standards of general administrative law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. This Court should follow those that have interpreted nondisclosure statutes narrowly. *See Anderson v. HHS*, 907 F.2d

936, 951 (10th Cir. 1990); *Alirez v. NLRB*, 676 F.2d 423, 425 (10th Cir. 1982); *Grasso v. IRS*, 785 F.2d 70, 75 (5th Cir. 1984); *Currie v. IRS*, 704 F.2d 523, 527, 530 (11th Cir. 1983); *DeLorme Publ'g Co. v. NOAA*, 917 F. Supp. 867, 870-71 (D. Me. 1996).

None of the records withheld under Exemption 3 pertain to 8 U.S.C. § 1202(f). Defendants lack authority for their Exemption 3 redactions.

Pinero alleges, "[i]nformation pertaining to protected individuals on seven pages was withheld pursuant to Exemption 3 because a statute the agency is unable to identify for confidentiality reasons explicitly prohibits disclosure of any information pertaining to the protected individual, except pursuant to exceptions not applicable here." Pinero Decl., ¶ 20.

The *Vaughn* index alleges Exemption 3 applies to the bodies of both emails and the: (1) subject lines on page 254; (2) subject lines on pages 289-90; (3) subject/attachment lines on page 362; (4) subject lines on page 381; and (5) subject lines on page 513-14. *See* Dkt. 37-1.

For each redaction, the *Vaughn* index alleges an "*unspecified statute* that applies to these withholdings explicitly prohibits the disclosure of any information pertaining to the protected individual, except pursuant to exceptions not applicable here." *Accord* Dkt. 37-1 at 116 (emphasis added). Defendants further allege they are "further unable to identify the applicable statute because doing so would circumvent the confidentiality protections the statute is intended to establish." *Accord id.*

Agencies and courts ordinarily specify the nondisclosure statutes upon which Exemption 3 withholdings are based, but courts have occasionally concealed the

nondisclosure statute that formed the basis for its ruling that the agency properly invoked Exemption 3, stating "national security would be compromised and threats to the safety of individuals would arise" if the court engaged in a specific discussion of the legal basis for Exemption 3's use in those exceptional cases. *Simpson v. Dep't of State*, No. 79-0674, 2 Gov't Disclosure Serv. (P-H) ¶ 81,280, at 81,798 (D.D.C. Apr. 30, 1981) (declining to identify Exemption 3 statute serving as basis for withholding, where "national security would be compromised and threats to the safety of individuals would arise upon specific discussion of the in camera submission").

Defendants do not invoke concerns relating to national security or individual safety. Instead, Defendants allege identifying the statute "would circumvent the confidentiality provisions the statute is intended to establish." Dkt. 36 at 34 (quoting Pinero Decl., ¶ 22). Defendants' asserted justification for refusing to identify the nondisclosure statute they rely upon is insufficient because "confidentiality" concerns are not extraordinary nor analogous to "national security" or "safety" concerns.

In their memorandum, Defendants request permission "to submit ex parte a short pleading outlining the statutory basis for the withholding with that in camera submission." Dkt. 36 at 34. Plaintiff strenuously objects to Defendants' request to submit ex parte arguments or pleadings to the Court and further objects to Defendants' attempt to claim Exemption 3 applies without explicitly identifying to Plaintiff which statute supports the application of the exemption. This arrangement is fundamentally unfair because it deprives Plaintiff of the opportunity to rebut Defendants' arguments on their merits and deprives the Court of the benefit of Plaintiff's statutory construction analysis and research,

circumventing the adversarial process. *E.g.*, *Vaughn*, 484 F.2d at 824-25. Considering Defendants are not invoking 8 U.S.C. § 1202(f) (the only immigration-related statute that has been previously found to fall within Exemption 3's ambit), the question of whether the statute Defendants rely upon falls within Exemption 3's narrow definition is a question of first impression. Questions of first impression, especially those relating to statutory construction, cannot be decided ex parte.

Defendants refuse to identify the statute they claim supports their (b)(3) redactions; no facts support upholding the redactions. Defendants have not even identified whether the statute they rely upon is a federal or state statute. *See Founding Church of Scientology v. Bell,* 603 F.3d 945, 952 (D.C. Cir. 1979) (Exemption 3 triggered by federal statutes).

"[T]he Government bears the burden of establishing that the withheld material falls within the scope of the federal statute upon which it relies." *McDonnell v. United States*, 4 F.3d 1227, 1249 (3d Cir. 1993). The government has not satisfied its burden of establishing that Exemption 3 applies.

### C. Defendants' Exemption 5 Redactions Are Unlawful.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5).

Plaintiff requests an in camera review of each challenged (b)(5) redaction to ensure each redaction is proper under Exemption 5 and to allow the Court to determine, where applicable, whether segregable parts of the records have been unlawfully withheld. *See*

*generally* Exhibit 4; Dkt. 27-4. Plaintiff submits Defendants have failed to release numerous segregable records.

### i. Deliberative Process Privilege

The deliberative process privilege aims to "prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). Three policy purposes have been held to constitute the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are actually adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Jordan v. DOJ*, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (en banc). The privilege protects the "decision making processes of government agencies." *Sears*, 421 U.S. at 150; *see also Missouri ex rel. Shorr v. U.S. Army Corps of Eng'rs*, 147 F.3d 708, 710 (8th Cir. 1998). "Because Exemption 5 is concerned with protecting the deliberative process itself, courts now focus less on the material sought and more on the effect of the material's release." *Schell v. HHS*, 843 F.2d 933, 940 (6th Cir. 1988).

Courts have established two fundamental requirements, both of which must be met, for the deliberative process privilege to be invoked. *See Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). First, the communication must be predecisional, *i.e.*, "[a]ntecedent to the adoption of an agency policy." *Jordan*, 591 F.3d at 774. "Communications that occur

[a]fter a policy has already been settled upon for example, a communication promulgating or implementing an established policy [a]re not privileged." *Id.* "The second prerequisite to privileged status is that the communication must be 'deliberative,' that is, it must actually be related to the process by which policies are formulated." *Id.* Timing alone does not determine whether a specified document is protected by the privilege:

> [I]t is not enough to assert, in the context of Exemption 5, that a document is used by a decision-maker in the determination of policy…. Rather, to come within the privilege, and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. Put another way, pre-decisional materials are not exempt merely because they are pre-decisional; they must also be a part of the agency give-and-take of the deliberative process by which the decision itself is made.

*Vaughn*, 523 F.2d at 1143-44. Purely factual materials that do not reflect a deliberative process are not protected. *EPA v. Mink*, 410 U.S. 73, 90 (1973). The burden is upon the agency to show that the information in question satisfies both requirements. *Coastal States Gas Corp.*, 617 F.2d at 866.

Defendants have failed to demonstrate their deliberative process redactions were lawful. For example, Pinero asserts records on pages 729-37 were redacted under the deliberative process privilege. Pinero Decl., ¶ 26. Pinero states the records "involve an exchange of opinion between Mr. Stolley and his superior, Deputy Principal Legal Advisor, regarding the best way to handle, as a matter of strategy, OCC St. Paul responses to attorneys at Contreras & Metelska law firm outside of formal replies to court-filings." *Id.* Pinero notes the communications include an "assessment and recommendation provided by Mr. Stolley to his superior… regarding the type of reciprocal treatment that is merited

by ICE toward the law firm in the future, based on past actions of its attorneys." *Id.*

The records from 729-37 with challenged (b)(5) redactions concern emails sent and received on August 12, 2020. Exhibit 3 at 109-16. Pinero asserts these records involve deliberations as to how to respond to Plaintiff outside of formal replies to court filings. Pinero Decl., ¶ 26. However, Mr. Stolley sent an email to an unknown person in ICE acknowledging as early as June 17, 2019 at 2:19 PM that "**More than a year ago I ceased any and all communications with anyone from [Plaintiff]. In other words, I shall do absolutely nothing to assist them.**" *See* Exhibit 3 at 1, 17. Thus, Stolley finalized his strategy regarding how to respond to Plaintiff outside of formal replies to court filings well before August 12, 2020. *Id.* Consequently, his August 12, 2020 emails were not antecedent to the adoption of any agency policy. *See Jordan*, 591 F.3d at 774. Instead, the communications promulgated or implemented the agency's prior policy regarding Plaintiff, which was finalized more than a year prior to June 17, 2019. *See id.* Defendants acknowledge as much in the *Vaughn* index by explaining that the email on page 735 involves Mr. Stolley "issu[ing] an instruction to all of his [subordinates] regarding how to deal with responses to the lawyers employed" by Plaintiff's law firm. Dkt. 37-1 at 142. Mr. Stolley "*then shares and further discusses with his superiors at the OPLA Headquarters.*" *Id.* (emphasis added). The communications Mr. Stolley made to his subordinates were final instructions setting out the agency's policy as to how to deal with Plaintiff; such communications are not deliberative and thus not entitled to privilege. *Jordan*, 591 F.3d at 774. The communications Mr. Stolley subsequently made to OPLA Headquarters are prototypical "[c]ommunications that occur [a]fter a policy has already been settled upon"

and consequently "[a]re not privileged." *Id.* The (b)(5) redactions on pages 729-37 are unlawful.

Disclosure of records redacted under Exemption 5 on pages 729-37 will not injure the policy rationale underlying the deliberative process privilege because none of these materials directly contribute to the formulation of important public policy, but instead relate to the formulation or implementation of illegal and discriminatory customs by individual government actors who are abusing the authority of their office. *See Soto v. City of Concord*, 162 F.R.D. 603, 612 (N.D. Cal. 1995) (collecting cases regarding scope of deliberative process privilege and the need for such communications to "directly contribute to the formulation of important public policy"); Exhibit 3 at 109-16. Even if releasing redacted portions might inhibit open, frank discussion on matters of policy between subordinates and superiors, such inhibitions relate only to policies that are discriminatory, illegal, or adopted in bad faith out of an individual government actor's animus for private individuals or organizations. *See Waters v. United States Capitol Police Bd.*, 216 F.R.D. 153, 163 (D.D.C. 2003) ("The Court of Appeals has indicated… **it is inconceivable that Congress intended federal agencies to shield from discovery information otherwise subject to the deliberative process privilege when that information bears on whether or not the agency discriminated against an employee**") (emphasis added); *In re Subpoena Duces Tecum*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) ("[I]t seems rather obvious to us that the privilege has no place in a Title VII action or in a constitutional claim for discrimination. … [I]f either the Constitution or a statute makes the nature of governmental officials' deliberations the issue, the privilege is a non sequitur. The central purpose of the

privilege is to foster government decisionmaking by protecting it from the chill of potential disclosure.") (citations omitted).

Disclosing materials redacted under Exemption 5 as deliberative (including but not limited to 729-37) will not harm the government by prematurely disclosing proposed policies before they are adopted, as the agency's policy/custom regarding Plaintiff was adopted in early 2018 or before. *E.g.*, Exhibit 3 at 1, 17. Disclosing such documents will not confuse the public about reasons and rationales that were not in fact ultimately the grounds for the agency's action; the grounds for the agency's action derive solely from Mr. Stolley's personal animus towards Plaintiff and its attorneys. *E.g.*, Exhibit 5. This is hardly lawful, much less worthy of protecting under the deliberative process privilege.

Plaintiff's arguments regarding pages 729-37 are representative of Plaintiff's arguments regarding each challenged deliberative privilege redaction identified in Plaintiff's Amended Complaint.

### ii.    Attorney Work-Product Privilege

Attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 509-10 (1947); Fed. R. Civ. P. 26(b)(3). The privilege ordinarily does not attach until at least "some articulable claim, likely to lead to litigation," has arisen. *Coastal States Gas Corp.*, 617 F.2d at 865. Litigation need not have commenced so long as specific claims have been identified which make litigation probable. *Accord Citizens for Responsibility and Ethics in Wash. v. NARA*, 583 F.Supp.2d 146, 160 (D.D.C. 2008). The mere fact that it is conceivable that litigation might occur at some unspecified time in the future will not

necessarily be sufficient to protect attorney-generated documents; "the policies of the FOIA would be largely defeated" if agencies were to withhold any documents created by attorneys "simply because litigation *might* someday occur." *Senate of P.R. v. DOJ*, 823 F.2d 574, 587 (D.C. Cir. 1987) (emphasis added).

Work-product privilege does not apply to documents prepared in an agency's ordinary course of business under circumstances that are not sufficiently related to litigation. *See Hennessey v. AID*, 1997 WL 537998, at *6 (4th Cir. Sept. 2, 1997) (refusing to apply privilege to report commissioned to complete project and not "because of the prospect of litigation," despite threat of suit). Documents prepared after a case is closed are presumed, absent some specific basis for concluding otherwise, not to have been prepared in anticipation of litigation. *See Senate of P.R.*, 823 F.2d at 586. Documents not originally prepared in anticipation of litigation cannot assume the protection of the work-product privilege merely through their later placement in a litigation-related file. *See Dow Jones & Co. v. DOJ*, 724 F.Supp. 985, 989 (D.D.C. 1989).

Work-product privilege remains applicable when information has been shared with a party holding a common interest with the agency. *Rashid v. U.S. Dep't of Justice*, No. 99–2461 (GK), 2001 U.S. Dist. LEXIS 26353, at *10 (D.D.C. June 12, 2001) (holding privilege inapplicable because agency failed to demonstrate common interest with third parties to whom it disclosed documents). *But cf. Goodrich Corp. v. EPA*, 593 F.Supp.2d 184, 192-93 (D.D.C. 2009) (holding that agency waived privilege by sharing documents with state agency, which in turn shared them with plaintiff's counsel).

With respect to work-product redactions, Plaintiff concedes that records which truly

fall within the scope of the doctrine are exempt from disclosure. Considering that Mr. Stolley is an attorney who manages other attorneys and communicates with attorneys in other government agency, Plaintiff expects that some of the redacted materials truly constitute work-product; Plaintiff does not challenge these redactions. However, Plaintiff believes that Defendants are hiding nonexempt material behind (b)(5) exemptions in bad faith and therefore requests the court review *in camera* all claimed work-product redactions. Plaintiff also alleges Defendants are claiming attorney work-product privilege for documents (1) prepared after a case was closed, and (2) not originally prepared in anticipation of litigation.

The email on page 82 is alleged to be both deliberative and work-product. *See* Dkt. 37-1 at 45-46; *cf.* Exhibit 3 at 4. Defendants' characterizations might be correct but Defendants' bad faith impairs this conclusion. If an email is deliberative but not work-product, the Court can order Defendants to segregate and release the factual statements; if that email is not deliberative but is work-product, the Court can hold Defendants properly applied Exemption 5. *See generally Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 371 (D.C. Cir. 2005) ("[F]actual material is itself privileged when it appears within documents that are attorney work product. If a document is fully protected as work product, then segregability is not required.").

On pages 256-57, it is unclear whether Defendants are claiming that there were partial redactions under Exemption 5 for work-product and deliberative information, or whether those exemptions were removed when the *Vaughn* index was prepared. *See* Dkt. 37-1 at 60-61 (*Vaughn* index claims redactions made under (b)(5) for attorney work-

product then also claims ICE no longer claims exemption (b)(5)); Exhibit 3 at 22-23. Regardless, Plaintiff has yet to receive any documents that do not contain (b)(5) redactions on pages 256-57. Exhibit 1 ¶¶ 6-7. Considering Defendants (1) initially redacted pages 256-57 under Exemption 5 claiming attorney work-product, (2) reevaluated that decision at the last possible moment, and (3) have not actually disclosed the unredacted versions to Plaintiff, Defendants seek to hide nonexempt responsive documents behind the attorney work-product label. *See, e.g.*, Dkt. 37-1 at 60-61, 91-92 (dealing with page 403); Exhibit 1 ¶ 8.

On page 424, Defendants claim that (b)(5) redactions were made to withhold deliberative and attorney work-product information. Dkt. 37-1 at 97-98. The *Vaughn* index claims an ICE attorney is providing a candid analysis to Mr. Stolley about how ICE should respond to private counsel's request for a stipulation in pending agency litigation. Dkt. 37-1 at 98. While it is possible the email Mr. Stolley received from an ICE employee was work-product, the chain of emails immediately preceding the redacted email demonstrates that in communications with staff at the immigration court, Plaintiff's attorney informed the court that Mr. Stolley's office: (1) has ignored their request to stipulate to removal, and (2) recently told an attorney employed by Plaintiff that no member of Plaintiff's firm should call Mr. Stolley's office for any reason. Exhibit 3 at 29-49. There is a substantial likelihood that the ICE-OPLA employee is not emailing Mr. Stolley about how ICE should respond to immigration counsel's request for a stipulation of removal in pending litigation, but instead constitutes an email prepared in the normal course of business related to damage control with the immigration course rather than relating to the actual merits of the case in

which a stipulation was requested. This is buttressed by the fact that the email from an ICE-OPLA employee asking how to respond was not redacted under Exemption 5. Exhibit 3 at 40.

### iii.   Attorney-Client Privilege

Attorney-client privilege concerns "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977); *see also Rein v. U.S. Patent and Trademark Office*, 553 F. 3d 353, 377 (4th Cir. 2009) (noting confidentiality requirement for privilege). This privilege is not limited to the context of litigation and extends to communications regarding "an opinion on the law." *E.g.*, *Rein*, 553 F.3d at 377. Documents containing only "standard legal analysis" are not covered by the privilege. *Lee v. FDIC*, 923 F.Supp. 451, 457-58 (S.D.N.Y. 1996). The privilege is inapplicable to an attorney's memoranda that was never communicated to the client. *Direct Response Consulting Serv. v. IRS*, 1995 WL 623282, at *3 (D.D.C. Aug. 21, 1995). "[I]t is clear that when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged" unless they reflect client confidences. *Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980).

Attorney-client privilege applies in situations where there are multiple clients who share a common interest. *See, e.g., Hanson v. AID*, 372 F.3d 286, 292 (4th Cir. 2004). However, just as in the discovery context, privilege can be waived by the client, though it cannot be unilaterally waived by the attorney. *See id.* at 293-94. Otherwise confidential agency memoranda are not protected under the privilege if they are authoritative

interpretations of agency law because "Exemption 5 and the attorney-client privilege may not be used to protect… agency law from disclosure to the public." *Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997).

Plaintiff concedes attorney-client privileged communications are exempted from disclosure *unless* privilege was waived by the client(s), the communications were not confidential, or unless another exception cognizable under the FOIA applies, such as the crime-fraud exception. *Nat'l Immi. Project of Nat. Lawyers Guild*, 2014 WL 6850977, at *5. Defendants do not state whether these well-known privilege exceptions/waivers were considered by the agency.

Illustratively, in every alleged attorney-client communication between the U.S. Attorney's Office ("USAO") and ICE or Mr. Stolley, ICE is the client and Mr. Stolley acts on ICE's behalf. Therefore, if Mr. Stolley forwards attorney-client emails to anyone who does not fall the common interest doctrine, privilege has been waived. If Mr. Stolley forwards privileged attorney-client emails only to his own staff inside of OPLA, Plaintiff concedes privilege has not been waived. If, however, Mr. Stolley or any of his staff forwarded that communication to anyone outside of the agency, privilege has been waived. Consider for example pages 405-06. Exhibit 3 at 24-25. On 405, a USAO attorney emails numerous individuals about a case, and includes Mr. Stolley on the email as ICE's representative. *Id.* at 24-25. A few hours later, Mr. Stolley forwards the privileged email to "# SPM Chief Counsel." *Id.* at 24. It is unclear whether # SPM Chief Counsel includes any former ICE employees or contractors who have not yet been removed from the listserv and who have access to their emails. *Id.* It is unclear who is on that email listserv or whether it

is truly limited only to employees of ICE's OPLA. *Id.* Pinero is silent on this issue. Pinero is also silent as to whether there was the slightest investigation into whether any of the individuals who received Mr. Stolley's privileged email forwarded it to anyone outside of ICE and, if so, who. Because ICE is the client, if *any* member of ICE forwarded the email to someone outside the agency who lacks a common interest in the information, the redaction is improper.

Consider further (b)(5) redactions on pages 474 and 480, which Defendants claim were necessary because of "attorney-client" privilege. *See* Dkt. 37-1 at 107-10; Exhibit 3 at 50, 56. In these records, OPLA is the attorney and ICE's Enforcement & Removal Operations ("ERO") unit is the client. *See id.* The *Vaughn* index indicates Mr. Stolley "acts as primary counsel to the Client ICE component of ERO, and thus to the ERO deportation officers in the St. Paul ERO field office." Dkt. 37-1 at 107. Defendants allege the ERO deportation officer is seeking advice and counsel from Mr. Stolley as to the legal meaning a court order. *Id.* This appears disingenuous as Mr. Stolley, rather than responding, forwarded the email to an unknown party, stating merely "FYSA" (which Plaintiff alleges means "for your situational awareness"). Exhibit 3 at 50. The communications between the ERO officer and Mr. Stolley concern facts acquired from other sources, such as an attorney employed by Plaintiff and a copy of a Court decision. Exhibit 3 at 50-61; *see Brinton*, 636 F.2d at 603. Any legal analysis Mr. Stolley may have provided is likely of the "standard legal analysis" variety that is nonprivileged. *See Lee*, 923 F.Supp. at 457-58. Lastly, if the ERO officer conveyed Mr. Stolley's position to Plaintiff's client at some point to engage in an enforcement action, ICE's client (ERO) waived the privilege of the communication

by communicating it to a third-party with no common interest.

If unredacted responsive records demonstrate Mr. Stolley forwarded privileged communications from his work email to his personal email, that must constitute a disclosure to a third party because it is a disclosure from a government agency to a private citizen. If Mr. Stolley has emailed any privileged information to his own personal email address from his government email address, that means he can forward said information from his personal email to third parties *ad infinitum* without being exposed as having waived privilege. By sending privileged information to himself, Mr. Stolley waived ICE's privilege by creating a copy of the communication in his official capacity and storing it in a location the government has no authority to exercise control over and no ability to access. This must constitute a waiver of privilege (to the extent the privilege was ICE's to waive; if the privilege was ERO's to waive, this argument ceases to apply).

On page 508, Defendants claim that Exemption 5 was applied to protect attorney-client communications between the USAO and their clients, ICE, and the Executive Office for Immigration Review ("EOIR"). Dkt. 37-1 at 114; Exhibit 3 at 62. As background, EOIR is a sub-agency of the DOJ and is responsible for the operation of the immigration courts; immigration judges are EOIR employees and OPLA employees are ICE/DHS employees that prosecute cases before EOIR. Defendants allege this is an attorney-client communication because the USAO provides legal advice and opinion to the federal agencies with equity in the case, including ICE and EOIR. Dkt. 37-1 at 114. Mr. Stolley then shares the emails with his own legal team at OPLA. *Id.*

The redacted email on 508 relates to *Lopez*, No. 20-CV-1330 (JRT/BRT) (D.

Minn.). Exhibit 3 at 62. Neither the original complaint nor the amended complaint name ICE or any ICE employee as a defendant. *See* No. 20-CV-1330 (D. Minn.), Dkts. 1, 6. Instead, the complaints name the Attorney General, two EOIR employees, and the Secretary of the Department of Homeland Security. The claims against the DHS Secretary related to his rulemaking power for the entirety of the DHS. *See id.*, Dkt. 6 ¶¶ 437-76. The claims against EOIR were more substantive. Neither ICE nor Mr. Stolley were clients of the USAO with respect to the *Lopez* case when Mr. Stolley received the email on 508. Thus, the "joint defense" rule is inapplicable to this communication. The USAO's decision to include Mr. Stolley in the email demonstrates the communication was not intended to be confidential or restricted only to clients with a common interest. Defendants have not sufficiently explained how ICE or Mr. Stolley shared a common interest with EOIR in relation to the *Lopez* suit.

The communication on page 587, redacted under (b)(5), is not adequately explained in the affidavit or *Vaughn* index. *See generally* Exhibit 3 at 68. The *Vaughn* index briefly notes a (b)(5) exemption occurred, but it does not explain why the document constitutes attorney-client or deliberative process privileged materials. Dkt. 37-1 at 119-20.

The communications on pages 593-606 are alleged to be deliberative and attorney-client privileged information. *See id.* at 120-21. In these communications, ICE is the client, Mr. Stolley is ICE's representative, and USAO is the attorney. *See id.*; Exhibit 3 at 74-87. Therefore, Mr. Stolley can waive the attorney-client privilege by forwarding the email to someone outside of ICE who lacks a common interest in the matter with ICE. On page 593, Mr. Stolley forwards an email from the USAO that is alleged to contain privileged

information to an unknown person whose name has been redacted under Exemptions 6 and 7-C, stating "I am so so so so so so done." Exhibit 3 at 74. The record does not demonstrate who Mr. Stolley forwarded this email to or whether it was forwarded outside of the agency thereby waiving privilege by the client. *Id.* Considering Mr. Stolley forwarded the entirety of the email chain, all of which is claimed to be privilege, the entire chain's claims of privilege may have been waived. *See id.* Defendants have not met their burden to demonstrate that this material is privileged.

Plaintiff requests the Court review the Exemption 6 and 7-C redactions at the top of 593 to determine whether Mr. Stolley waived privilege by forwarding the email and permit Plaintiff to conduct limited discovery as to that exact issue before ruling on these motions if the Court is unable to determine from the face of the document whether the recipient of Mr. Stolley's email was someone employed by ICE or who shared a common interest with respect to the privileged matter. The same is true of other chains addressing the same discussion. *See, e.g.*, Dkt. 37-1 at 126-27 (noting 626-31 is another version of pages 593-606); *id.* at 128-29 (same for pages 639-646); Exhibit 3 at 74-102.

The communications on pages 704 and 708 redacted under Exemption 5 as attorney-client material are unlawful. *See* Exhibit 3 at 103, 107. The communications are alleged to relate to "confidential communications between attorneys and their clients relating to a legal matter for which the client has sought professional advice." Dkt. 37-1 at 137-38. However, Mr. Stolley adopted a policy of unlawfully discriminating against Plaintiff and the attorneys it employs in or before 2018, and thereby against Plaintiff's noncitizen clients. *E.g.*, Exhibit 3 at 1, 17. Mr. Stolley's email to the USAO occurred on August 7, 2020 and

was in relation to the foreseeable consequences of Mr. Stolley's discriminatory and unlawful conduct towards Plaintiff. Mr. Stolley's statement to the USAO on pages 704 and 708 is nonprivileged under the crime-fraud exception to privilege. *E.g.*, *Nat'l Immi. Project of Nat. Lawyers Guild*, 2014 WL 6850977, at *5; *Conservation Force v. Jewell*, 2014 WL 4327949, at *10-13 (D.D.C. Sept. 2, 2014) (considering crime-fraud exception in FOIA context); *see* Exhibit 3 at 103-08.

"The crime-fraud exception strips [any] privilege from attorney-client communications that 'relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 21994). Some courts have held the crime-fraud exception applies in circumstances involving a "lawyer's unprofessional conduct" and to communications made in furtherance of "bad faith litigation conduct." *E.g., Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983); *Cleveland Hair Clinic, Inc. v. Puig*, 968 F.Supp. 1227, 1241 (N.D. Ill. 1996).

The communications on 704 and 708 are within the ambit of the crime-fraud exception because: (1) the communication is one made by Mr. Stolley as a client to the USAO, (2) the unredacted communication will demonstrate Mr. Stolley knowingly and willfully (i) falsified, concealed, or covered up by any trick, scheme or device a material fact, or (ii) made any materially false, fictious, or fraudulent statement or representation, and (3) Mr. Stolley's communication constitutes a crime under 18 U.S.C. § 1001 and is thus nonprivileged. Mr. Stolley's conduct is also non-privileged under the crime-fraud exception because Mr. Stolley's conduct is "unprofessional" and his communications were made in furtherance of "bad faith litigation conduct before the immigration courts." These

same considerations are potentially applicable to every statement and representation Mr. Stolley made to the USAO as its client that specifically related to Mr. Stolley's policy of discriminating against Plaintiff. *See generally* Exhibit 5; Dkt. 27-1 at 6-8, 10-11, 29, 36-45, 49-52, 55, 57-58, 62-63, 65-66, 70, 76, 82, 84,88, 96.

The (b)(5) redaction on 892 is suspect. *See* Exhibit 3 at 119. The communication from Plaintiff's attorney was sent to ICE requesting ICE to terminate Plaintiff's client's removal proceedings in its exercise of prosecutorial discretion on April 28, 2021 at 1:41 PM. *Id.* at 118-20. Less than two minutes later, the same attorney "replied all" to the same email he just sent, saying "Actually, never mind. Please leave the case opened." *Id.* On April 28, 2021 at 7:13 PM, Mr. Stolley forwarded the entire chain to the USAO, ostensibly asking if it was okay to terminate Plaintiff's client's proceedings because of the 1:41 PM request and pretend he did not see or receive the 1:43 PM request that cancelled the earlier request. *Id.* At minimum, this email is likely evidence of Defendants' bad faith in matters involving Plaintiff, Plaintiff's employees, and Plaintiff's clients.

Plaintiff requests the Court review in camera each challenged (b)(5) redaction and determine whether certain material was unlawfully withheld.

### D.  Defendants' Exemption 6 and 7-C Redactions Are Unlawful.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act.'" *Multi Ag Media, LLC v. USDA*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation and internal quotations omitted).

Exemption 7-C exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information… could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

ICE applied Exemptions 6 and 7-C to redact personally identifying information ("PII") of attorneys employed by Plaintiff that did not provide a signed privacy waiver as to their PII. Pinero Decl., Dkt. 37 ¶ 20.

> i. *The Redacted Records Do Not Satisfy the "Unwarranted Invasion" Standards of Exemptions 6 or 7-C.*

The agency erred by redacting PII of attorneys Plaintiff employed; the privacy right implicated in the emails sent between Plaintiff's law firm's employees and Mr. Stolley belongs to Plaintiff (a law firm), not to its employees. *E.g.*, *Muick v. Glenayre Electronics*, 280 F.3d 741, 743 (7th Cir. 2002) (holding employee had no right of privacy in computer employer lent employee for use in workplace); Exhibit 1 ¶¶ 9-10; Exhibit 1-A. Attorneys employed by a law firm do not get to take their emails account with them when they cease employment and almost invariably lose access to the emails they had previously sent while at that firm because the emails do not belong to the employee, but to the law firm. Exhibit 1-A. There is no expectation of privacy between the attorney who sends an email from their firm-provided email address and the firm that employs them. *Id.* When an attorney is employed by a law firm, they must provide their social security number, proof of work authorization, their home address, their phone number, and a variety of other PII, meaning every law firm will already have their prior employees' PII on record, negating the privacy

concerns of disclosing PII about an employee to a law firm.

If an attorney sends or receives an email in the scope of their employment from a firm-provided email account, any review by the employer of those emails is not an invasion of the employee's privacy, much less an unwarranted one. Exhibit 1 ¶¶ 9-10; Exhibit 1-A. If the employee does not want their employer to review the information in their emails, they should send those emails from a different email account that the firm does not have access to or responsibility over. *Id.* There is no reason to hold Exemptions 6 or 7-C permit Defendants to redact PII of persons who were employed by Plaintiff at the time the responsive documents were generated or received by Plaintiff's employees.

As to Exemption 7-C, the exemption does not apply to records sent or received by Plaintiff's employees regardless of privacy concerns because the records were not compiled for law enforcement purposes.

>    ii.   *The Redacted Records Are Not Part of Personnel, Medical, or Similar Files.*

Defendants have not established the emails redacted under Exemption 6 are "similar" to personnel or medical files.

Defendants allege, "[r]ecords that apply to or describe a particular individual, including investigative records, qualify as 'personnel,' 'medical,' or 'similar files' under Exemption 6." Pinero Decl., ¶ 39. Defendants argue "Mr. Stolley's email archive is a similar file covered by Exemption 6, just like any lawyer's correspondence file that discusses individuals involve in cases ICE is investigating and prosecuting." Def. Memo. at 32-33. Defendants support this assertion by citing *Citizens for Resp. & Ethics in*

*Washington v. U.S. Dep't of State* ["*Citizens*"] and *Bernegger v. Executive Office for United States Attorneys*. *Id.* at 33 (citations omitted). In those cases, the courts noted prior cases hold "email addresses generally fall within the definition of 'similar files' for the purposes of Exemption 6." *See Citizens*, 2022 WL 1801054, at *13.

Plaintiff concedes *some* government employee emails constitute "similar files" under Exemption 6. However, emails between agency employees that disparage opposing counsel, otherwise represent steps taken towards the enactment of a discriminatory or unlawful office policy, and general nonspecific emails unrelated to a specific case ICE-OPLA is prosecuting do not constitute "similar files." For example, on page 149, Mr. Stolley forwards an email to Jeffrey Field and an unknown party and states in the body of the forwarded email "FYSA." Exhibit 3 at 5. Defendants redacted the email address of the person who was cc'd on the email. *Id.* This specific email cannot constitute a file similar to a medical or personnel file. The record is replete with other examples. *E.g.*, Exhibit 4 at 2-4, 17, 36-38, 41-44, 48, 50, 97, 151-53. The Court should review each challenged (b)(6) email and employee name redaction in camera and determine whether each redaction factually relates to a "similar file" for purposes of Exemption 6. If the Court determines challenged (b)(6) redactions were made in emails that do not constitute "similar files," those records must be disclosed unless they are protected under Exemption 7-C.

       iii.    *Defendants Redacted Information Under Exemption 6 That Does Not Constitute a Clearly Unwarranted Invasion of Personal Privacy.*

Nonauthoritative court decisions have stated "email address owners have a strong privacy interest in ensuring that they are not subjected to unwanted communications

resulting from the disclosure of their email address." *E.g.*, *Citizens*, 2022 WL 1801054, at *13. Government employees have "a significant personal interest in preventing the burden of unsolicited emails and harassment." *Shurtleff v. EPA*, 991 F.Supp.2d 1, 18 (D.D.C. 2013). However, disclosure of names and email addresses "'is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a de minimis threat depends upon the characteristic(s) revealed… and the consequences likely to ensue.'" *Kleinert v. BLM*, 132 F.Supp.3d 79, 96 (D.D.C. 2015) (citation omitted).

Defendants' redactions of the names, email addresses, and telephone numbers of ICE-OPLA *attorneys* does not constitute a "*clearly unwarranted*" invasion of personal privacy. ICE-OPLA already releases as a matter of course the names, email addresses, and phone numbers of each attorney employed by the field office in question. *See* Exhibit 7; 5 C.F.R. § 293.311(a)(1) (designating employee names as *per se* public information). Plaintiff already has complete access to such information. Plaintiff seeks the names, emails, and phone numbers of certain ICE-OPLA attorneys (or, at minimum, the names) not to harass any ICE employee, but instead to understand who Mr. Stolley communicated with regarding problematic, defamatory, or otherwise unlawful statements or directives.

Plaintiff waives any disclosure requests of the email addresses, names, and telephone numbers of other ICE employees (i.e., those who are not OPLA attorneys) and USAO employees since such information is not already released by their agencies as a matter of course.

Defendants have not adequately explained why/how releasing the names and email address of ICE-OPLA employees constitutes an inherent and significant threat to the

privacy of those listed. *See Kleinert*, 132 F.Supp.3d at 96. Defendants' statements on this issue reference only vague, conclusory threats that are insufficient to satisfy Defendants' burdens of proof and persuasion. *See* Pinero Decl., ¶¶ 43-49.

Assuming *arguendo* Defendants identified threats to the privacy interests of ICE-OPLA attorneys that may manifest if the redacted information is released, such threats do not outweigh Plaintiff's asserted public disclosure interest—*i.e.,* identifying the individual ICE-OPLA employees who sent or received certain problematic communications to/from Mr. Stolley. Mr. Stolley has a strong influence over the attorneys he supervises; his conduct towards Plaintiff and its attorneys is likely to have an outsized effect on ICE-OPLA attorneys who have agreed with or ratified Mr. Stolley's discriminatory and unlawful policies and customs. The public is interested in knowing which ICE-OPLA employees may need corrective training because of their communications with Mr. Stolley.

     iv.    *Defendants Redacted Information Under Exemption 7-C That Cannot Reasonably be Expected to Constitute an Unwarranted Invasion of Personal Privacy.*

A record is considered to have been compiled for law enforcement purposes if it was created or acquired in the course of an *investigation* related to the enforcement of federal laws and the nexus between the investigation and one of the agency's law enforcement duties is based on information sufficient to support at least a colorable claim of its rationality.

*Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) (internal quotation marks omitted) (emphasis added).

Most of the records redacted under Exemption 7-C were not compiled for law enforcement purposes.

For example, on page 181, Mr. Stolley forwarded an email to someone within his

office that stated he "do[es] not communicate with her or with any lawyer from that firm"

after an attorney employed by Plaintiff emailed Mr. Stolley in relation to a case before the

immigration court. Exhibit 3 at 17. Plaintiff's attorney informed Mr. Stolley she was having

a hard time getting access to her client's documents and sought instruction as to what she

needed to do to get those documents. *Id.* The names and email addresses of the recipient

of Mr. Stolley's email were redacted under Exemptions 6 and 7-C. *Id.* As established

above, such records were not properly redacted under Exemption 6. The redaction under

Exemption 7-C is improper because this email is not a record compiled "for law

enforcement purposes." The email was not created or acquired during an investigation.

Instead, it was sent to prevent Plaintiff's employee from conducting her own investigation

by denying her documents in Defendants' possession that should have been provided to

Plaintiff's attorney as the legal representative for the attorney's client. No nexus exists

between any law enforcement investigation and the redacted information. The record is

replete with other examples. *E.g.*, Exhibit 4 at 2-4, 17, 36-38, 41-44, 48, 50, 97, 151-53.

Thus, the Court should review each challenged (b)(7)(C) email and employee name

redaction in camera and determine whether each redaction factually relates to a law

enforcement investigation for purposes of Exemption 7-C. If the Court determines

challenged (b)(7)(C) redactions were made in emails that lack an adequate nexus to a law

enforcement investigation, those records must be disclosed unless they are protected under

Exemption 6.

Plaintiff incorporates by reference all prior arguments relating to whether the names,

email addresses, and telephone numbers of ICE-OPLA employees were properly redacted

under Exemption 6 and submits that such arguments and evidence in support thereof demonstrate that Defendants have failed to meet their burden of establishing that the records redacted under Exemption 7-C cannot reasonably be expected to constitute an unwarranted invasion of personal privacy if such records are released. Plaintiff specially reemphasizes that ICE-OPLA attorney emails, names, and phone numbers are already disclosed by Defendants as a matter of course, meaning there is no reason to believe the release of such records in the present context might reasonably be expected to constitute an unwarranted invasion of personal privacy assuming such records are factually law enforcement records for purposes of Exemption 7-C.

> v.    The OPM's "Security/Sensitive" Designation Does Not Permit the Redactions Made Under Exemptions 6 or 7-C.

Defendants redacted the names and contact details of most ICE employees under Exemptions 6 and 7-C. *E.g.*, Pinero Decl., ¶¶ 44-49. Defendants support these redactions by referencing an Office of Personnel Management ("OPM") designation that approved ICE's request to be designated as a "security/sensitive" agency for FOIA purposes on June 11, 2020. *Id.* ¶ 44.

Defendants did not submit a copy of the alleged OPM designation. If Defendants intend to rely on this document, they must introduce the original letter into the judicial record. *See* Fed. R. Evid. 1002. By failing to introduce the OPM designation into the judicial record, Defendants have failed to meet their burden of establishing that ICE has been granted *carte blanche* to apply Exemption 6 to every FOIA processed by the agency that involves the name of any ICE employee.

Even if OPM did designate ICE as a security/sensitive agency in a 2020 designation, this designation was contrary to law and is thus invalid.

The OPM Director's powers are limited to those provided by statute and regulation. 5 U.S.C. § 1103 governs the functions of the Director of OPM may perform, and 5 U.S.C. § 1104 governs delegations of the Director's authority for personnel management. Neither statute provides or indicates OPM has the statutory authority to designate any agency as a "security/sensitive" for the purpose of enlarging the scope of Exemption 6 or 7-C of the FOIA. Similarly, none of the OPM regulations relating to the FOIA provide that the Director of OPM has the power to issue orders that unilaterally broaden the scope of a statutory exemption to the FOIA for entire agencies in the absence of explicit congressional assent. *See generally* 5 C.F.R. Part 293, Subpart C, §§ 293.301-293.311.

Of special interest is 5 C.F.R. § 293.311, which relates to certain categories of information about present and former federal employees that is made available to the public. This regulation provides:

(a) **The following information** from both the OPF and employee performance file system folders, their automated equivalent records, and from other personnel record files that constitute an agency record within the meaning of the FOIA and which are under the control of the Office, **about most present and former Federal employees, is available to the public:**

   **(1) Name;**

   …

(b) The Office or agency will generally not disclose information where the data sought is a list of names, present or past position titles, grades, salaries, performance standards, and/or duty stations of Federal employees which, as determined by the official responsible for custody of the information:

(1) Is selected in such a way that would reveal more about the employee on whom information is sought than the six enumerated items, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy; or

(2) Would otherwise be protected from mandatory disclosure under an exemption of the FOIA. …

5 C.F.R. § 293.311 (emphasis added).

Defendants' claims regarding the OPM designation require intentionally misreading the regulations governing OPM. OPM lacks the statutory or regulatory authority to permit agencies to redact every name of the agency's former or current federal employees under Exemptions 6 or 7-C.

## CONCLUSION

The Court should grant Plaintiff's motion.

DATED: May 22, 2023                    Respectfully submitted,

                                       /s/ *Nico Ratkowski*
                                       Nico Ratkowski
                                       MN Attorney ID: 0400413
                                       Contreras & Metelska, P.A.
                                       663 University Avenue W., STE 200
                                       Saint Paul, MN 55104
                                       P: (651) 771-0019
                                       F: (651) 772-4300
                                       nico@contrerasmetelska.com

                                       *Attorney for Plaintiff*